# EXHIBIT 2

# PART 1 OF 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EVAN SINGLETON and VITO LOGRASSO, individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br>vs.<br><br>WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>           Defendant. | Case No. 5:15-cv-00223-LS |

## DEFENDANT'S MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a) DUE TO FORUM-SELECTION CLAUSES IN THE CONTRACTS BETWEEN THE PARTIES

Defendant World Wrestling Entertainment, Inc. ("WWE") hereby moves this Court to transfer venue from the United States District Court for the Eastern District of Pennsylvania to the United States District Court for the District of Connecticut pursuant to 28 U.S.C. § 1404(a) and the decision of the United States Supreme Court in *Atlantic Marine Constr. Co., Inc. v. United States Dist. Ct. for W. Dist. of Texas*, 134 S. Ct. 568 (2013). The grounds for this Motion are set forth in the accompanying memorandum of law, which is incorporated herein by reference as though fully set forth herein. Briefly stated, the parties in this case all agreed to a mandatory forum-selection provision establishing the U.S. District Court for the District of Connecticut as the exclusive forum for any disputes arising out or related in any way to the contracts for professional wrestling services between the parties. The Supreme Court ruled in *Atlantic Marine* that a district court should ordinarily transfer a case to the forum specified in a forum-selection clause unless there are extraordinary circumstances unrelated to the convenience of the parties. No such circumstances are present here.

Dated: February 27, 2015

Respectfully submitted,

By:  s/ Matthew H. Haverstick
     Matthew H. Haverstick
     CONRAD O'BRIEN PC
     1500 Market Street
     Centre Square West Tower, Suite 3900
     Philadelphia, PA 19102-1921
     Telephone: (215) 864-9600
     Facsimile: (215) 523-9725
     E-mail: mhaverstick@conradobrien.com

     Jerry S. McDevitt  (pro hac vice pending)
     Curtis B. Krasik  (pro hac vice pending)
     K&L GATES LLP
     Pittsburgh, PA  15222-2613
     Telephone: (412) 355-6500
     Facsimile: (412) 355-6501
     E-mail: jerry.mcdevitt@klgates.com

     *Counsel for Defendant*
     *World Wrestling Entertainment, Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EVAN SINGLETON and VITO LOGRASSO, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>vs.<br><br>WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>                Defendant. | Case No. 5:15-cv-00223-LS |

## ORDER

**AND NOW**, this _____ day of _____, 2015, upon consideration of Defendant World Wrestling Entertainment, Inc.'s ("WWE") Motion to Transfer Venue pursuant to 28 U.S.C. § 1404(a) Due to Forum-Selection Clauses in the Contracts Between the Parties, **IT IS HEREBY ORDERED** as follows: Plaintiffs Evan Singleton and Vito Lograsso both are subject to mandatory forum selection clauses contained in written contracts with WWE. Based on those mandatory forum selection clauses, this action shall be transferred from the United States District Court for the Eastern District of Pennsylvania to the United States District Court for the District of Connecticut pursuant to *Atlantic Marine Constr. Co., Inc. v. United States Dist. Ct. for W. Dist. of Texas*, 134 S. Ct. 568 (2013).

_____

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing DEFENDANT WORLD WRESTLING

ENTERTAINMENT, INC.'S MOTION TO TRANSFER VENUE DUE TO FORUM-

SELECTION CLAUSES IN THE CONTRACTS BETWEEN THE PARTIES was served by

the Court's CM/ECF System to all counsel registered to receive electronic notice.


February 27, 2015                                    s/ Matthew H. Haverstick
                                                     Matthew H. Haverstick

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

EVAN SINGLETON and VITO LOGRASSO,
individually and on behalf of all others
similarly situated,

                  Plaintiffs,

vs.

WORLD WRESTLING ENTERTAINMENT,
INC.,

                  Defendant.

Case No. 5:15-cv-00223-LS

---

**DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S MEMORANDUM
OF LAW IN SUPPORT OF MOTION TO TRANSFER VENUE DUE TO FORUM-
SELECTION CLAUSES IN THE CONTRACTS BETWEEN THE PARTIES**

---

Matthew H. Haverstick
CONRAD O'BRIEN PC
1500 Market Street
Centre Square West Tower, Suite 3900
Philadelphia, PA 19102-1921
Telephone:  (215) 864-9600
Facsimile: (215) 523-9725
E-mail: mhaverstick@conradobrien.com

Jerry S. McDevitt  (pro hac vice pending)
Curtis B. Krasik  (pro hac vice pending)
K&L GATES LLP
210 Sixth Avenue
Pittsburgh, PA  15222-2613
Telephone:  (412) 355-6500
Facsimile:  (412) 355-6501
E-mail: jerry.mcdevitt@klgates.com

*Counsel for Defendant
World Wrestling Entertainment, Inc.*

## TABLE OF CONTENTS

Page

I.    BACKGROUND ................................................................................................1

    A.    Summary of the Allegations ...............................................................1
    B.    Plaintiffs Are Subject to Identical Contractual Forum-Selection
        Provisions.....................................................................................2
    C.    WWE's Operations and Substantial Relationship to the State of
        Connecticut .................................................................................2

II.   WWE's ATTEMPTS TO OBTAIN PLAINTIFFS' COMPLIANCE WITH
    THE FORUM-SELECTION CLAUSES........................................................3

III.  ARGUMENT ...................................................................................................7

    A.    Standard of Review...........................................................................7
    B.    The District of Connecticut Has Subject Matter Jurisdiction And Venue
        is Proper in the District of Connecticut...........................................9
    C.    The Private Interest Factors Conclusively Require a Transfer ...............10
    D.    The Public Interest Factors Overwhelmingly Favor a Transfer.............11

IV.   CONCLUSION ................................................................................................13

## TABLE OF AUTHORITIES

Page

**Cases**

*Asphalt Paving Systems, Inc. v. General Combustion Corp.*, 215 W.L. 167378 (D. N.J. 2015) ............................................................................................................................... 8

*Atlantic Marine Construction Co., Inc. v. United States Dist. Ct. for W. Dist. of Texas*, 134 S. Ct. 568 (2013)........................................................................................... passim

*Barbera v. Lowe's Home Ctrs., Inc.*, No. 09–1617, 2009 WL 1362608 (E.D. Pa. May 15, 2009) .............................................................................................................................. 12

*Dawes v. Publish America LLP*, 563 Fed. App. 117 (3d Cir. 2014)............................................... 8

*Depuy v. Edwards*, 23 F. Supp. 3d 472 (E.D. Pa. 2014).................................................................. 9

*Geosonics, Inc. v. Aegean Associates, Inc.*, No. 2:14-cv-908, 2014 WL 7409529 (W.D. Pa. Dec. 31, 2014) .................................................................................................................. 10

*Jolly v. Faucett*, No. 06-3286, 2007 WL 137833 (E.D. Pa. Jan. 16, 2007) ................................... 12

*Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 880 (3d Cir. 1995) .................................................. 11

*Kessler v. Royal Caribbean Cruises, Ltd.*, No. CIV. A. 02-7974, 2002 WL 32130105 (E.D. Pa. Jan. 27, 2003) ............................................................................................................ 4

*Mato v. Window World, Inc.*, No. 10–7617, 2011 WL 710473 (E.D. Pa. Feb. 28, 2011) ...... 10, 12

*North Am. Dental Wholesalers, Inc. v. Danaher Corp.*, No. 11–247, 2011 WL 3606866 (E.D. Pa. Aug. 15, 2011)........................................................................................................... 12

*Rogal v. Skilstaf, Inc.*, 446 F. Supp. 2d 334 (E.D. Pa. 2006) ................................................. 10, 11

*Saladworks, LLC v. Sottosanto Salads, LLC*, Civil Action No. 13-3764, 2014 WL 2862241 (E.D. Pa. June 24, 2014) ............................................................................................ 8

*SKF USA Inc. v. Okkeise*, 992 F. Supp. 2d 432 (E.D. Pa. 2014) ......................................... 3, 8, 13

*Smith v. HireRight Solutions, Inc.*, No. CIV.A. 09-6007, 2010 WL 2270541 (E.D. Pa. June 7, 2010)........................................................................................................................... 10

*Wall Street Aubrey Golf, LLC v. Aubrey*, 189 Fed. Appx. 82, 85 (3d Cir. 2006)........................... 8

*Wallace v. Mercantile Cnty. Bank*, No. CIV A 06-3974, 2006 WL 3302490 (E.D. Pa. Nov. 9, 2006) ................................................................................................................... 9, 13

**Rules**

28 U.S.C. § 1332(d) ............................................................................................................. 9

28 U.S.C. § 1391(b) ........................................................................................................ 6, 9

28 U.S.C. § 1391(c) ........................................................................................................... 10

28 U.S.C. § 1404(a) ........................................................................................................ 1, 7

Defendant World Wrestling Entertainment, Inc. ("WWE") respectfully submits this Memorandum of Law in support of its Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) Due to Forum-Selection Clauses in the Contracts Between the Parties (the "Motion").

## I.   BACKGROUND

### A.   Summary of the Allegations

Plaintiffs are professional wrestlers who performed their craft for WWE. Both now claim that they suffered head injuries during the time they wrestled for WWE. *See* Compl. ¶¶ 128-136. Plaintiffs assert that WWE allegedly subjected them and other similarly-situated wrestlers to such physical harm and purportedly failed to warn wrestlers about the consequences of head trauma that they purportedly sustained while wrestling for WWE. *See* Compl. ¶ 1. As a result, plaintiffs seek to certify a broad class of "[a]ll persons who currently or formerly wrestled for [WWE] or a predecessor company, and who reside in the United States." Compl. ¶ 134.

Plaintiff Singleton wrestled for WWE from 2012 to 2013. *See* Compl. ¶ 16. Plaintiff LoGrasso alleges that he wrestled for WWE from 1991 to 1998 and from 2005 to 2007. *See* Compl. ¶ 17. This allegation is not accurate. In the 1990s, Mr. LoGrasso was an occasional "jobber." *See* Affidavit of C. Scott Amann ("Amann Aff.") ¶ 6, attached at Tab 1. In wrestling parlance, a "jobber" is a temporary wrestler used on an as-needed basis essentially as a prop to lose to more prominent wrestlers. *Id.* A search of WWE business records found that between 1991 and 1998, WWE only paid Mr. LoGrasso: (i) $650 for four events worked in 1991; (ii) $900 for six events worked in 1992; (iii) $675 for three events worked in 1993; and (iv) $200 for one event worked in 1997. *Id.* ¶ 5. There is no record of any payment by WWE to Mr. LoGrasso in 1994, 1995, 1996, or 1998. *Id.* He did perform for WWE on a more regular basis from 2005-2007 pursuant to a formal contract, as discussed herein.

**B.      Plaintiffs Are Subject to Identical Contractual Forum-Selection Provisions**

Each Plaintiff wrestled for WWE pursuant to an agreement called a booking contract (the "Booking Contract").  *See* Affidavit of James W. Langham ("Langham Aff.") ¶ 5 and Exs. A & B, attached at Tab 2.  Each Booking Contract spells out the professional wrestling services to be rendered by Messrs. Singleton and LoGrasso, and the terms of agreement between the parties relating to those services.  *See id.*, Exs. A & B.  Each Plaintiff's Booking Contract contains a mandatory forum-selection clause that requires any and all disputes arising out of or relating in any way to those services to be litigated in the United States District Court for the District of Connecticut.  *See id.*, Exs. A & B § 13.8.  The identical clauses at issue state:

> **The parties agree to submit any and all disputes arising out of or relating in any way to this Agreement exclusively to the jurisdiction of the United States District Court of Connecticut**.  The provision to submit all claims, disputes or matters in question to the Federal court in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

*See Id.*, Exs. A & B § 13.8 (emphasis added).

In fact, booking contracts typically entered into between WWE and its wrestlers after June 13, 1991, which is a sizeable portion of the putative class, require that disputes arising out of or relating to the booking contracts be litigated in Connecticut.  *See* Langham Aff. ¶ 6.

**C.      WWE's Operations and Substantial Relationship to the State of Connecticut**

WWE is an integrated media company principally engaged in the development, production and promotion of television programming and live events featuring its unique brand of wrestling-based sports entertainment.  WWE is a Delaware corporation with its corporate headquarters in Stamford, Connecticut.  *See* Langham Aff. ¶ 4.  The "small group of related executives" whom plaintiffs allege "manage both policies and the conduct of wrestlers during

2

matches," *see* Compl. ¶ 19, all reside in Connecticut and have substantial work responsibilities in WWE's Connecticut headquarters. *See* Langham Aff. ¶ 8. WWE maintains the vast majority of its business records in Connecticut, either in its corporate headquarters or in an off-site records storage facility. *See id.* ¶ 9. This Court has recognized that a state bears a substantial relationship to the parties to a forum-selection clause when the corporate party has its principal place of business and headquarters in the chosen state. *SKF USA Inc. v. Okkeise*, 992 F. Supp. 2d 432 (E.D. Pa. 2014).

## II.   WWE'S ATTEMPTS TO OBTAIN PLAINTIFFS' COMPLIANCE WITH THE FORUM-SELECTION CLAUSES

On January 23, 2015, WWE's counsel advised plaintiffs' counsel of the forum-selection clauses and asked for their justification for ignoring those clauses and filing suit in the Eastern District of Pennsylvania. None of the multiple law firms representing plaintiffs responded.

Thus, on Monday, February 23, 2015, WWE's counsel again sought plaintiffs' position regarding their non-compliance with the forum-selection clauses. *See* Tab 3, pp. 5-7. WWE's counsel provided plaintiffs' counsel with the exact language of the forum-selection clauses and advised of the holding of the United States Supreme Court that such clauses are to be given controlling weight in all but the most exceptional cases. *See id.*, p. 6. Plaintiffs' counsel was asked either to take a voluntary dismissal under Fed. R. Civ. P. 41 without prejudice and then re-file in Connecticut or concur in a transfer motion to effectuate the forum-selection clauses. *See id.*, p. 7. Lastly, WWE's counsel pointed out that there was no difference between the two methods because the Supreme Court had made clear that the law of the state which the parties had agreed to be the forum would supply the choice of law rules once transfer is effectuated. *See id.*

That simple proposal to plaintiffs' counsel triggered what became a series of evasive responses emblematic of the gamesmanship condemned by the Supreme Court's controlling

3

decision of *Atlantic Marine Construction Co., Inc. v. United States Dist. Ct. for W. Dist. of Texas,* 134 S. Ct. 568 (2013).

First, plaintiffs' counsel indicated they agreed to transfer Mr. Singleton's claims to Connecticut but, inconsistently, refused to agree to transfer Mr. LoGrasso's claims, even though he signed a forum-selection clause identical to Mr. Singleton.[1]  *See id.*, p. 4.  The only reason provided for their inconsistent position was the erroneous assertion that Mr. LoGrasso "wrestled without any contract for many years of his career."  *See id.*[2]

On February, 25, 2015, WWE's counsel urged plaintiffs' counsel to reconsider their inconsistent position, pointing out that both plaintiffs had signed identical forum-selection clauses. *See id.*, pp. 3-4.  WWE's counsel also pointed out that it made little sense to split a purported class action into two different venues. *See id.*  WWE's counsel concluded by pointing out that the reasons provided for not honoring Mr. LoGrasso's agreement on the proper forum did not constitute the requisite "extraordinary circumstances" required by the Supreme Court. *See id.*, p. 4.  Later that same morning, plaintiffs' counsel responded that they would reconsider and "get back to you asap," but indicated that he might need "until first thing tomorrow morning" due to the travel of other counsel. *See id.*, p. 3.

On February 26, 2015, WWE's counsel inquired as to whether plaintiffs' counsel had

---

[1] Counsel for Mr. Singleton conditioned his agreement on WWE agreeing to take Mr. Singleton's deposition in his home town if he is unable to travel, which of course WWE agreed to readily. *See* Tab 3, p.3.

[2] Notably, even prior to *Atlantic Marine*'s strong directive to enforce forum-selection clauses, this Court previously rejected a similar argument by a plaintiff seeking to avoid a mandatory forum-selection clause.  *See Kessler v. Royal Caribbean Cruises, Ltd.*, No. CIV. A. 02-7974, 2002 WL 32130105, at *2 (E.D. Pa. Jan. 27, 2003) ("Plaintiffs' first argument appears to be that, because this action involves alleged acts of misrepresentation by Defendant prior to the parties entering the contract in question, venue for the action should not be governed by the forum selection clause in the contract.  Initially, the Court notes that Plaintiffs have failed to cite any authority for this argument.  In addition, the contention that all of the acts by Defendant complained of by Plaintiffs in this action occurred prior to entering the contract is inaccurate.").

4

reconsidered the transfer of Mr. LoGrasso's claims to Connecticut and provided specific factual

information to counsel correcting the stated basis for refusing to honor the mandatory forum-

selection clause — that he had supposedly performed for many years without a contract. *See id.*,

p. 2. It was pointed out that Mr. LoGrasso had wrestled only 4 days in 1991, 6 days in 1992, 3

days in 1993, and 1 day in 1997, before he signed the formal contract in 2005 containing a

forum-selection clause. Plaintiffs' counsel finally responded later in the afternoon, as follows:

> We do not agree with any of your emails. Or, that the contract
> applies for either of our clients. However, we will not oppose a
> 1404(a) transfer for Lograsso and Singleton. Our clients do not
> waive any rights to challenge the applicability of any alleged
> contract.

*Id.*, p. 1. No further explanation was given for their response.

Plaintiffs' position appears to be an attempt to avoid the rule articulated by the Supreme

Court in *Atlantic Marine* that "when a party bound by a forum-selection clause flouts its

contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not

carry with it the original venue's choice-of-law rules." 134 S. Ct. at 582. In rejecting the *Van

Dusen* rule that otherwise would apply the state law applicable in the transferor court in the event

of a § 1404(a) transfer, the Supreme Court reasoned that "a plaintiff who files suit in violation of

a forum-selection clause enjoys no 'privilege' with respect to its choice of forum, and therefore it

is entitled to no concomitant 'state-law advantages," Not only would it be inequitable to allow

the plaintiff to fasten its choice of substantive law to the venue transfer, but it would also

encourage gamesmanship." *Id.* at 583.

Such gamesmanship is precisely what plaintiffs are attempting here. By agreeing to a §

1404(a) transfer of venue but attempting to preserve some argument about whether transfer was

pursuant to the mandatory forum-selection clauses, plaintiffs are seeking avoid the application of

the clear law of the Supreme Court cited above.  As the Supreme Court held, "we will not apply the *Van Dusen* rule when a transfer stems from enforcement of a forum-selection clause."  *Id.*

The issue before this Court, therefore, is now squarely presented:  whether to apply the rule of *Atlantic Marine* and transfer this case pursuant to the mandatory forum-selection clauses to which both plaintiffs agreed.

Not only are plaintiffs' personal claims subject to a mandatory forum-selection clause requiring transfer to the District of Connecticut but, as further explained in the Langham Affidavit submitted in support of this Motion, the majority of the putative plaintiff class is subject to similar forum-selection clauses in their WWE contracts mandating the litigation of the purported class' claims in the District of Connecticut as well.

Aside from plaintiffs' gamesmanship, as the parties "defying the forum-selection clause," plaintiffs bear the heavy burden of demonstrating "exceptional circumstances" that transfer is unwarranted pursuant to the mandatory forum-selection clauses.  Plaintiffs cannot meet that burden here, and did not even attempt to do so in the pre-motion correspondence.  For the following reasons, the parties' forum-selection clause and the other Section 1404(a) considerations mandate the transfer of this case to the District of Connecticut.

*First*, the District of Connecticut would have subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, and venue would be proper in the District of Connecticut under 28 U.S.C. § 1391(b) because WWE maintains its principal place of business in the State of Connecticut.

*Second*, because the parties are subject to a mandatory contractual forum-selection clause requiring the action to be litigated in the District of Connecticut, the Supreme Court requires that clause be given controlling weight absent exceptional factors.  There are no such factors here.

6

Plaintiffs each signed contracts to provide professional wrestling services in which they voluntarily agreed to submit "all disputes arising out of or relating in any way" to their agreement in Connecticut, and thereby waived the right to challenge the preselected forum as inconvenient. Under well-established Supreme Court precedent, mandatory forum-selection clauses must be enforced to protect the parties' legitimate expectations, and should be given "controlling weight" in "all but the most exceptional cases." Plaintiffs cannot carry their "heavy" burden of demonstrating any such exceptional circumstances in this case and, in fact, have conceded that transfer is appropriate.

*Third*, the public interest also overwhelmingly favors the transfer of this case to the District of Connecticut. If plaintiffs were to succeed, they would be able to enforce a judgment in the District of Connecticut because WWE is domiciled there. Trial would also be conducted more easily, expeditiously and inexpensively in the District of Connecticut, because most of the witnesses are WWE employees or representatives who work or reside in Connecticut and because WWE's corporate records and other documentary evidence are also located in Connecticut. A transfer would also lighten this District's docket, which is far more congested than that of the District of Connecticut. A transfer would not offend any pertinent public policies because plaintiffs will be able to pursue their claims in the District of Connecticut. Furthermore, the federal courts of Connecticut exercising diversity jurisdiction are more familiar with Connecticut law than this Court, which sits in a different Federal Circuit. Because the public interest factors "will rarely defeat a transfer motion," the forum-selection clause controls and the case should be transferred to Connecticut.

### III.   ARGUMENT

#### A.   Standard of Review

28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the

interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." "When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." *Atlantic Marine*, 134 S. Ct. at 581. Thus, where the parties are subject to a valid forum-selection clause, the Court is to give plaintiff's choice of forum "no weight." *Id.*

Forum-selection clauses are "presumptively valid." *Wall Street Aubrey Golf, LLC v. Aubrey*, 189 Fed. Appx. 82, 85 (3d Cir. 2006); *see also Saladworks, LLC v. Sottosanto Salads, LLC*, Civil Action No. 13-3764, 2014 WL 2862241, at *2 (E.D. Pa. June 24, 2014). "The enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system." *Atlantic Marine*, 134 S.Ct. at 581 (internal quotations omitted). "For that reason, and because the overarching consideration under § 1404(a) is whether a transfer would promote the interest of justice, *a valid forum-selection clause should be given controlling weight in all but the most exceptional cases*." *Id.* (internal quotations and brackets omitted) (emphasis added). Plaintiffs "bear the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id.*; *SKF USA, Inc.*, 992 F. Supp. 2d at 432 ("The party opposing a forum selection clause bears the heavy burden of proving that the clause should not be enforced.").

Forum-selection clauses that dictate an exclusive venue, as is the case here, are considered mandatory and presumed to be enforceable. *See Dawes v. Publish America LLP*, 563 Fed. App. 117, 118 (3d Cir. 2014). Here, the forum-selection clause agreed to by the parties uses the word "shall," which also dictates an exclusive venue. *See Wall Street Aubrey Golf*, 189 Fed. Appx. at 85-86 (noting that "shall" suffices, without more, to indicate mandatory intent); *see also Asphalt Paving Systems, Inc. v. General Combustion Corp.*, 215 WL 167378 (D. N.J. 2015)

(noting that use of the word "shall" evinces mandatory nature).  As such, the identical forum-selection clauses here are clearly mandatory under controlling law.

To resist application of the otherwise mandatory transfer, the burden is on plaintiffs under *Atlantic Marine* to show extraordinary circumstances unrelated to the convenience of the parties that clearly disfavor a transfer.  Under the analysis now required by *Atlantic Marine*, unlike a typical motion to transfer pursuant to Section 1404(a), the Court "should not consider arguments about the parties' private interests . . . [and in fact] must deem private-interest factors to weigh entirely in favor of the preselected forum." *Atlantic Marine*, 134 S.Ct. at 582. *See also Depuy v. Edwards*, 23 F. Supp. 3d 472 (E.D. Pa. 2014) (refusing to consider private interests in 1404 motions as required by *Atlantic Marine*).  Although public interest factors can be considered, "[b]ecause public-interest factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.*

**B.     The District of Connecticut Has Subject Matter Jurisdiction And Venue is Proper in the District of Connecticut**

In determining whether an action might have been brought in the transferee district, the court assesses whether the transferee district would have jurisdiction over the matter and whether venue would be proper there. *See Wallace v. Mercantile Cnty. Bank*, No. CIV A 06-3974, 2006 WL 3302490, at *3 (E.D. Pa. Nov. 9, 2006) (granting motion to transfer).  As plaintiffs admit in their Complaint, the District of Connecticut would have subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). *See* Compl. ¶ 14.

Likewise, venue is proper in the District of Connecticut.  Pursuant to 28 U.S.C. § 1391(b)(1), a case may be brought in "a judicial district in which any defendant resides . . . ." Here, WWE maintains its principal place of business, and thus resides, in Connecticut. *See* 28

9

U.S.C. § 1391(b)(1) & (c)(1). Therefore, the first prong of the Section 1404 transfer analysis is met.

## C.    The Private Interest Factors Conclusively Require a Transfer

The private interest factors conclusively mandate transferring this case to the District of Connecticut because plaintiffs are subject to identical mandatory forum-selection clauses that require this case to be litigated in the District of Connecticut.  As the Supreme Court expressly held in *Atlantic Marine*, an analysis of the private interest factors becomes unnecessary when the parties are subject to a forum-selection clause, because the court "must deem the private-interest factors to weigh entirely in favor of the preselected forum."[3]  134 S.Ct. at 582.  The Supreme Court also instructed that the plaintiff's choice of forum is entitled to no weight when a forum-selection clause applies.  *Id.; see also Rogal v. Skilstaf, Inc.*, 446 F. Supp. 2d 334 (E.D. Pa. 2006) (party opposing transfer has "heavy burden" to show forum-selection clause should be ignored); *Mato v. Window World, Inc.*, No. 10–7617, 2011 WL 710473, at *3 (E.D. Pa. Feb. 28, 2011) (same); *Geosonics, Inc. v. Aegean Associates, Inc.*, No. 2:14-cv-908, 2014 WL 7409529, at *3 (W.D. Pa. Dec. 31, 2014) (forum selection clause renders plaintiff's choice of forum irrelevant).

Here, each plaintiff's Booking Contract requires that disputes between the parties be litigated in the District of Connecticut.  Plaintiffs voluntarily and expressly agreed that they would bring suit in Connecticut when they signed their respective agreements.  *Atlantic Marine,*

---

[3] Even in the absence of the Supreme Court's holding in *Atlantic Marine*, the individual private interest factors would still favor a transfer to the District of Connecticut.  First, most of the witnesses are WWE executives and employees who reside and/or work in Connecticut.  *See* Langham Aff. ¶ 8.  Second, most of the documentary evidence will also be located in Connecticut.  *See id.* ¶ 9.  Third, plaintiffs' choice of forum would be given less deference because this case is styled as a class action and plaintiffs have not alleged that any of the underlying alleged conduct occurred in Pennsylvania, or that they were injured in Pennsylvania. *See Smith v. HireRight Solutions, Inc.*, No. CIV.A. 09-6007, 2010 WL 2270541, at *3 (E.D. Pa. June 7, 2010) (less deference provided to class action plaintiffs' choice of forum; granting motion to transfer).

10

134 S.Ct. at 581 (a forum-selection clause "represents the parties' agreement as to the most proper forum"); *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 880 (3d Cir. 1995) (same). Plaintiffs cannot "flout[ their] contractual obligation" to bring suit wherever they please. *Atlantic Marine*, 134 S.Ct. at 581-82. Plaintiffs have blatantly disregarded their contractual obligations to file suit in the District of Connecticut, and thus the Court should transfer this case to that forum where it should have been brought, if at all, in the first instance.

### D.    The Public Interest Factors Overwhelmingly Favor a Transfer

The Court in *Atlantic Marine* made clear that only public interest factors are to be considered, but also that such factors rarely suffice to defeat a mandatory forum-selection clause. *See Atlantic Marine*, 134 S.Ct. at 582 ("Public interest factors will rarely defeat a transfer motion."). Thus, the practical effect is that a mandatory forum-selection clause should control.

Public interest factors include: "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases." *Jumara*, 55 F.3d at 879-880 (internal citations omitted).  Here, all the public interest factors favor a transfer to the District of Connecticut.

*First*, if successful, plaintiffs will be able to enforce a judgment more easily in the District of Connecticut where WWE is domiciled.  *Rogal*, 446 F. Supp. 2d at 337 (noting in public interest analysis that it would be easier to enforce judgment in transferee district because defendant is located there).

*Second*, any trial would be conducted more easily, expeditiously and inexpensively in the District of Connecticut because most of the witnesses are WWE employees or representatives

11

who work or reside in Connecticut, including the alleged "small group of related [WWE] executives," *see* Compl. ¶ 21, and because WWE's corporate records and other documentary evidence are also located in Connecticut. *See Barbera v. Lowe's Home Ctrs., Inc.*, No. 09–1617, 2009 WL 1362608, at *3 (E.D. Pa. May 15, 2009) (transferring negligence case in part because much of relevant evidence and witnesses are located in transferee district); *Jolly v. Faucett*, No. 06-3286, 2007 WL 137833, at *3 (E.D. Pa. Jan. 16, 2007) (public interests favored transfer partly because defendants were from transferee district). Transporting these witnesses to Pennsylvania will also be costly, and will significantly burden the "small group of related [WWE] executives" who have substantial work responsibilities in Connecticut.

*Third*, the District of Connecticut's docket is much less congested than that of this District. *See North Am. Dental Wholesalers, Inc. v. Danaher Corp.*, No. 11–247, 2011 WL 3606866, at *6 (E.D. Pa. Aug. 15, 2011) (noting transferee court's "substantially lighter caseload" as favoring transfer); *Mato*, 2011 WL 710473, at *6 (same). For example, through September 2014, the District of Connecticut had 3,044 total pending cases, whereas this District had more than three times as many (10,952). Similarly, the District of Connecticut had less pending cases per judge (381) than this District (508).[4]

*Fourth*, there is no indication that transferring this case to the District of Connecticut would offend any applicable public policy. Plaintiffs will be able to pursue their claims in the District of Connecticut. Moreover, Connecticut has a greater interest in adjudicating claims related to alleged wrongdoings that were allegedly committed by a Connecticut resident. *See North Am. Dental Wholesalers, Inc.*, 2011 WL 3606866, at *6 (California had more substantial

---

[4] *See* Federal Court Management Statistics, available at
http://www.uscourts.gov/viewer.aspx?doc=/uscourts/Statistics/FederalCourtManagementStatistics/2014/district-fcms-profiles-june-2014.pdf&page=8 (last visited February 10, 2014).

interest in adjudicating suit because it involved conduct of individuals in California and corporation with principal place of business in California); *Wallace*, 2006 WL 3302490, at *4 (Maryland had greater interest in resolving dispute because case involved alleged misconduct by defendant bank with its principal place of business in Maryland). *See also SKF USA, Inc.*, 992 F. Supp. 2d at 432 (noting that state where corporation has principal place of business bears a substantial relationship to the parties.)

    *Finally*, judges in the District of Connecticut are likely more familiar with Connecticut law than judges in this District. At a minimum, a court would have to consider Connecticut's choice of law rules because, as the Supreme Court held in *Atlantic Marine*, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules . . . ." 134 S.Ct. at 582.

    In sum, the public interest factors conclusively establish that this case should be transferred to the District of Connecticut.

## IV.   **CONCLUSION**

    For all these reasons, the Court should grant WWE's Motion to transfer this case to the District of Connecticut.

Dated:  February 27, 2015                    Respectfully submitted,

                              By:  s/ Matthew H. Haverstick
                                   _____
                                   Matthew H. Haverstick
                                   CONRAD O'BRIEN PC
                                   1500 Market Street
                                   Centre Square West Tower, Suite 3900
                                   Philadelphia, PA 19102-1921
                                   Telephone:  (215) 864-9600
                                   Facsimile:  (215) 523-9725
                                   E-mail:  mhaverstick@conradobrien.com

                                   Jerry S. McDevitt  (pro hac vice pending)
                                   Curtis B. Krasik  (pro hac vice pending)
                                   K&L GATES LLP
                                   210 Sixth Avenue
                                   Pittsburgh, PA  15222-2613
                                   Telephone:  (412) 355-6500
                                   Facsimile:  (412) 355-6501
                                   E-mail: jerry.mcdevitt@klgates.com

                                   *Counsel for World Wrestling Entertainment, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER VENUE DUE TO FORUM-SELECTION CLAUSES IN THE CONTRACTS BETWEEN THE PARTIES was served by the Court's CM/ECF System to all counsel registered to receive electronic notice.

February 27, 2015                              s/ Matthew H. Haverstick
                                               Matthew H. Haverstick

# TAB 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EVAN SINGLETON and VITO LOGRASSO, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>vs.<br><br>WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>       Defendant. | Case No. 5:15-cv-00223-LS |

## AFFIDAVIT OF C. SCOTT AMANN

State of Connecticut )
        ) ss:
County of Fairfield  )

I, C. Scott Amann, being first duly sworn, hereby depose and say:

1. I am over eighteen (18) years of age. I have personal knowledge of the matters set forth herein or, where indicated, have reviewed WWE corporate records, and am competent to testify thereto.

2. I am employed as the Vice President, Legal and Business Affairs of World Wrestling Entertainment, Inc. ("WWE"). In that capacity, I provide legal counsel to, among other areas, the WWE talent relations department and I have gained direct and substantial knowledge of such areas of WWE's business.

3.    I am aware of the lawsuit filed by Evan Singleton and Vito LoGrasso against WWE and have reviewed the allegations asserted in Messrs. Singleton's and LoGrasso's Complaint.

4.    In response to the allegation that Mr. LoGrasso supposedly wrestled with WWE from 1991 to 1998, I supervised a search of WWE business records reflecting payments to Mr. LoGrasso to assess the accuracy of the allegation that Mr. LoGrasso wrestled with WWE in those years.

5.    The search found that, between 1991 and 1998, WWE only paid Mr. LoGrasso as follows: (i) $650 for four events worked in 1991; (ii) $900 for six events worked in 1992; (iii) $675 for three events worked in 1993; and (iv) $200 for one event worked in 1997. There is no record of any payment by WWE to Mr. LoGrasso in 1994, 1995, 1996, or 1998.

6.    The minimal payments to Mr. LoGrasso in 1991, 1992, 1993, and 1997 for only a handful of events indicate that Mr. LoGrasso was not a full-time wrestler with WWE in any of those years, but rather was a sporadically-used, temporary "jobber." In wrestling parlance, a "jobber" is a temporary wrestler used on an as-needed basis essentially as a prop to lose to more prominent wrestlers.

C. Scott Amann, Vice President, Legal and Business Affairs

Subscribed and sworn to before me
this 26th day of February, 2015.

Notary Public
My Commission Expires:     JANET P. COLE
                           NOTARY PUBLIC
                           MY COMMISSION EXPIRES MARCH 31, 2019

# TAB 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EVAN SINGLETON and VITO LOGRASSO, individually and on behalf of all others similarly situated,<br><br>                          Plaintiffs,<br><br>vs.<br><br>WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>                        Defendant. | Case No. 5:15-cv-00223-LS |

## AFFIDAVIT OF JAMES W. LANGHAM

State of Connecticut  )
                    )  ss:
County of Fairfield   )

       I, James W. Langham, being first duly sworn, hereby depose and say:

       1.     I am over eighteen (18) years of age.  I have personal knowledge of the matters set forth herein or, where indicated, have reviewed WWE corporate records, and am competent to testify thereto.

       2.     I am employed as the Senior Vice President and Assistant General Counsel of World Wrestling Entertainment, Inc. ("WWE").  In that capacity, I assist in the oversight of WWE's legal department and I have gained direct and substantial knowledge of WWE's business operations.

3.     WWE is an integrated media company principally engaged in the development, production, and promotion of television programming and live events, featuring its unique brand of wrestling-based sports entertainment.

4.     WWE is a Delaware corporation with its corporate headquarters in Stamford, Connecticut.

5.     Plaintiffs Evan Singleton and Vito Lograsso each wrestled for WWE pursuant to an agreement called a booking contract (the "Booking Contract"). Attached at Exhibits A and B, respectively, are true and correct copies of Messrs. Singleton's and Lograsso's Booking Contracts. Each Plaintiff's Booking Contract contains the identical mandatory forum selection clause that requires their claims to be litigated in the United States District Court for the District of Connecticut. Specifically, the clauses at issue state:

> The parties agree to submit any and all disputes arising out of or relating in any way to this Agreement exclusively to the jurisdiction of the United States District Court of Connecticut. The provision to submit all claims, disputes or matters in question to the Federal court in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

See Exhibits A and B, ¶ 13.8.

6.     In fact, booking contracts typically entered into between WWE and its wrestlers after June 13, 1991 require that any disputes arising out of or relating to the booking contracts be litigated in Connecticut.

7.     Each Plaintiff's Booking Contract also contains a choice of law provision that states: "This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut, exclusive of its provisions relating to conflicts of law." See Exhibits A and B, ¶ 13.7.

8.     The WWE executives identified in Plaintiff's Complaint, specifically, the "small group of related executives whom Plaintiff alleges "tightly control" WWE, *see* Complaint ¶ 19, all reside in Connecticut and have substantial work responsibilities in WWE's Connecticut headquarters. Additionally, the vast majority, if not all, of WWE's employees who would have discoverable information regarding Plaintiff's claims also work out of WWE's Connecticut headquarters.

9.     WWE maintains the vast majority of its business records in Connecticut, either in its corporate headquarters or in an off-site records storage facility.

James W. Langham, Senior Vice President and
Assistant General Counsel

Subscribed and sworn to before me
this 24 day of February, 2015.

Notary Public
My Commission Expires: 11/30/18

AMY L. ANNUCCI
NOTARY PUBLIC
MY COMMISSION EXPIRES NOVEMBER 30, 2018

# Exhibit  A

ORIGINAL

# WORLD WRESTLING ENTERTAINMENT, INC.
## BOOKING CONTRACT

This World Wrestling Entertainment, Inc. Booking Contract ("Agreement"), made effective as of the date World Wrestling Entertainment, Inc. executes said Agreement ("Effective Date"), by and between WORLD WRESTLING ENTERTAINMENT, INC., a Delaware corporation, with its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902 (hereinafter referred to as "PROMOTER"), and EVAN MITCHELL SINGLETON, an individual residing at 1115 Wheatland Avenue, Apt. G5, Lancaster, Pennsylvania 17603 (hereinafter referred to as "WRESTLER").

### PREMISES

WHEREAS, PROMOTER is duly licensed, as required, to conduct professional wrestling exhibitions and is actually engaged in the business throughout the world of organizing, publicizing, arranging, staging, conducting professional wrestling exhibitions and/or Events, as defined below, and representing professional wrestlers in the promotion and exploitation of a professional wrestler's name, likeness and personality; and

WHEREAS, PROMOTER has established a worldwide network of television stations which regularly broadcast PROMOTER's wrestling programs for purposes of publicizing PROMOTER's professional wrestling exhibitions and/or Events, as defined below, and PROMOTER has established a network of cable, satellite and internet organizations which regularly broadcast, transmit, stream and exhibit PROMOTER's professional wrestling Events on a pay-per-view and subscription basis; and in addition thereto, PROMOTER has developed and produced certain other television programs, which are also used to publicize, display and promote PROMOTER's professional wrestling exhibitions; and

WHEREAS, PROMOTER's business operations afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his wrestling services and his standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and/or Events, as defined below, and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by PROMOTER constitute demonstrations of wrestling skills and abilities designed to provide athletic-styled entertainment to the public, and such professional wrestling exhibitions and Events constitute entertainment and are not competitive sports; and

WHEREAS, WRESTLER desires PROMOTER to arrange professional wrestling exhibitions and/or Events, as defined below, for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, public appearances, and merchandising activities, or otherwise;

NOW THEREFORE, in consideration of the mutual promises and agreements as set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties intending to be legally bound, do hereby agree as follows:

## 1. BOOKING

1.1     WRESTLER hereby grants exclusively to PROMOTER, and PROMOTER hereby accepts, the following worldwide rights:

1

(a)     During the Term, the exclusive worldwide rights to WRESTLER's services, appearances, and/or performances in the entertainment industry.  Without limiting the generality of the foregoing, such worldwide rights shall include, without limitation, the right to engage WRESTLER's services, appearances, and/or performances in: (i) those professional wrestling matches designated by PROMOTER and those other events, engagements, appearances, filmings, photography shoots, autograph signings and other business and charitable events designated by WWE relating to professional wrestling or sports entertainment, whether or not staged before a live audience, in a television broadcast studio, on location or otherwise (collectively, the "Events"); and (ii) all other events, engagements, appearances, filmings, photography shoots, autograph signings and other business and charitable events that are not related to professional wrestling or sports entertainment in connection with movies, films, commercials, product endorsements, videos, television programs, radio, magazines, books, theatre, Internet or any other media in the entertainment industry (collectively, "Other Appearances").  Pursuant to Section 13.5 herein and during the Term of this Agreement, WRESTLER acknowledges and agrees that PROMOTER, in its sole discretion, shall have the right to assign WRESTLER's obligations under this Agreement for any period of time as PROMOTER sees fit to other promoters in order to enhance or improve WRESTLER's overall wrestling abilities, in-ring skills, conditioning, or other attributes deemed necessary by PROMOTER.

(b)     During the Term and thereafter as provided for in this Agreement, the right to sell or otherwise distribute tickets of admission to the general public for viewing of any or all of the Events that include the performance or appearance of WRESTLER, as well as the right to exhibit, broadcast and transmit the Footage, as defined in Section 2.1, via closed circuit transmission, pay-per-view transmission, subscription transmission (e.g., subscription video on demand), video on demand transmission, video exhibition, or any other medium now known or hereinafter discovered.

(c)     During the Term of this Agreement and thereafter as provided for in this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of WRESTLER Intellectual Property, as defined herein below, through any means whatsoever including internet websites, merchandising, commercial tie-ups, publishing, personal appearances, performances in non-wrestling events, and endorsements.

1.2     In consideration of WRESTLER's granting of rights, license and other services, as set forth herein, and provided WRESTLER faithfully and fully performs all obligations hereunder, PROMOTER shall endeavor to book WRESTLER as an individual or as a member of a group, which determination shall be made in PROMOTER's sole discretion, in wrestling matches and at various Events.

## 2. WORKS

2.1     WRESTLER hereby grants to PROMOTER the exclusive right during the Term to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereinafter discovered, WRESTLER's appearance, performance, commentary, and any other work product for or related to the Events or for or related to any and all of the services performed by WRESTLER pursuant to the terms herein. (These recordings by tape, film, photograph, disc, or otherwise are collectively referred to herein as the "Footage").

2.2     Notwithstanding the termination of this Agreement for any reason, and notwithstanding any other provision of this Agreement, PROMOTER shall have the right to produce, reproduce, reissue, manipulate, reconfigure, license, manufacture, record, perform, exhibit, broadcast, or otherwise disseminate the Footage in perpetuity by any form of media, now or hereafter devised (including without limitation, free, cable, pay cable, closed circuit and pay-per-view television, the internet, video on demand, and subscription video on demand).

2.3     WRESTLER's appearance, performance and work product in connection in any way with the Events, Footage, WRESTLER's services and the rights granted herein shall be deemed work for hire; and notwithstanding the termination of this Agreement, PROMOTER shall own, in perpetuity, all Footage and all of the rights, results, products and proceeds in and to, or derived from the Events, Footage, WRESTLER's services and the rights granted herein (including without limitation, all incidents, dialogue, characters, actions, routines, ideas, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with the Events, Footage, WRESTLER's services and the rights granted herein) and PROMOTER may obtain copyright and/or trademark and/or any other legal protection therefor, now known or hereinafter discovered, in the name of PROMOTER and/or on behalf of PROMOTER's designee.

2.4     If PROMOTER directs WRESTLER, either singly or in conjunction with PROMOTER, to create, design or develop any copyrightable work (herein referred to as a "Development"), such Development shall be deemed work for hire and PROMOTER shall own such Development.  All Footage and Developments referred to in this Agreement are collectively referred to as "Works".

2.5     All Works and WRESTLER's contributions thereto shall belong solely and exclusively to PROMOTER in perpetuity notwithstanding any termination of this Agreement.  .To the extent that such Works are considered: (i) contributions to collective works, (ii) a compilation; (iii) a supplementary work and/or (iv) as part or component of a motion picture or other audio-visual work, the parties hereby expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.).  In accordance therewith, all rights in and to the Works shall belong exclusively to PROMOTER in perpetuity, notwithstanding any termination of this Agreement.  To the extent that such Works are deemed works other than "works made for hire," WRESTLER hereby irrevocably assigns in perpetuity to PROMOTER all right, title and interest in and to all rights in such Works and all renewals and extensions of the copyrights or other rights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries.

## 3.  INTELLECTUAL PROPERTY

3.1     All service marks, trademarks and other distinctive and identifying indicia used by WRESTLER prior to the Effective Date in connection with the business of professional wrestling, including but not limited to WRESTLER's legal name, nickname, ring name, likeness, personality, character, caricatures, signature, costumes, props, gimmicks, gestures, routines and themes, which are owned by WRESTLER or in which WRESTLER has any rights anywhere in the world (collectively, the "WRESTLER Intellectual Property") are described and identified on Exhibit A attached hereto and incorporated herein by reference.  WRESTLER hereby assigns to PROMOTER the right during the Term and thereafter as provided for in this Agreement including any Sell Off Period set forth in Section 4.3 and PROMOTER hereby accepts all worldwide right, title and interest in and to WRESTLER's Intellectual Property, including, but not limited to, the rights to license, reproduce, manipulate, promote, expose, exploit and otherwise use the WRESTLER Intellectual Property.   WRESTLER further acknowledges and agrees that PROMOTER shall own in perpetuity all Footage, as defined in Section 2.1 of the Agreement, and that PROMOTER shall have perpetual rights in the Footage, as set forth in Section 2.2 of this Agreement.

3.2     Except for the WRESTLER Intellectual Property specifically set forth on Exhibit A, any intellectual property rights, including but not limited to trademarks, service marks, copyrighted works, and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with

3

WRESTLER's performance in the business of professional wrestling or sports entertainment which were procured, owned or created by PROMOTER during the Term or those which were procured, owned or created by PROMOTER prior to the Term and which are described and identified on Exhibit B attached hereto and incorporated herein by reference (collectively the "PROMOTER Intellectual Property") shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement.

3.3     PROMOTER may from time to time during the Term create or develop trademarks, service marks, and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment which WRESTLER acknowledges shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement. In addition, WRESTLER agrees to assign and relinquish to PROMOTER any and all claims of ownership and/or good will that may be acquired by WRESTLER now or in the future to and from such character name and image. With respect to all of the foregoing, WRESTLER agrees to immediately execute an amendment to this Agreement to add to Exhibit B any additional intellectual property rights created pursuant to this Section 3.3 as PROMOTER Intellectual Property.

3.4     WRESTLER Intellectual Property and PROMOTER Intellectual Property are hereinafter collectively referred to as "Intellectual Property."

3.5     WRESTLER agrees to cooperate fully and in good faith with PROMOTER for the purpose of securing and preserving PROMOTER's rights in and to the Intellectual Property. In connection herewith, WRESTLER acknowledges and hereby grants to PROMOTER the exclusive worldwide right during the Term of this Agreement (with respect to WRESTLER Intellectual Property) and in perpetuity (with respect to PROMOTER Intellectual Property) to apply for and obtain trademarks, service marks, copyrights and other registrations throughout the world in PROMOTER's name and/or on behalf of PROMOTER's designee and to enforce any and all of PROMOTER's rights therein.   At PROMOTER's expense and request, PROMOTER and WRESTLER shall take such steps, as PROMOTER deems necessary, for any registration or any litigation or other proceeding, to protect and enforce any and all of PROMOTER's rights in the WRESTLER Intellectual Property and/or PROMOTER Intellectual Property and/or Works. Further, WRESTLER authorizes PROMOTER to execute any documents on his behalf that are required by the U.S. Patent and Trademark Office in order to protect the aforementioned Intellectual Property.

## 4. MERCHANDISING

4.1     WRESTLER hereby agrees that PROMOTER shall have the exclusive right in perpetuity to use and exploit WRESTLER Intellectual Property in connection with the manufacture, production, reproduction, reissuance, manipulation, reconfiguration, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of any and all copyrighted work incorporating the WRESTLER Intellectual Property. PROMOTER shall own in perpetuity all copyrights in such copyrighted work and PROMOTER shall be entitled to obtain copyright registrations in PROMOTER's name or on behalf of its designee. WRESTLER shall provide all reasonable assistance to PROMOTER in so obtaining such copyright registrations, and WRESTLER authorizes PROMOTER to execute any documents on WRESTLER's behalf as attorney-in-fact that are required by the United States Copyright Office.

4.2     In addition to the perpetual rights to use and exploit WRESTLER Intellectual Property as set forth in Section 4.1 of this Agreement, WRESTLER agrees that during the Term and any applicable Sell Off Period as

4

provided for in this Agreement, PROMOTER shall have the exclusive right to use, exploit, and license the WRESTLER Intellectual Property in connection with the manufacture, production, reproduction, reissuance, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of goods and merchandise incorporating the WRESTLER Intellectual Property.

4.3    Sell Off Period.   Upon the expiration or termination of this Agreement, PROMOTER shall have the right to sell any goods and merchandise in inventory, on hand or manufactured containing WRESTLER Intellectual Property for a period of ninety (90) days immediately following such expiration or termination ("Sell Off Period") provided, however, that: (i) there shall be no restriction on PROMOTER's rights to use or exploit WRESTLER Intellectual Property in connection with the perpetual rights granted herein by WRESTLER; and (ii) with respect to goods, merchandise and/or programming that include the WRESTLER Intellectual Property regarding which PROMOTER has made a material time, resources and/or financial investment prior to expiration or termination of this Agreement and which have a commercial life that extends beyond the Sell Off Period (including, without limitation, video games, animated books and/or television programs, etc.), PROMOTER shall have the right to continue development and exploitation of such goods, merchandise and/or programming until the end of the commercial life thereof.

4.4    Book Rights.   WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to use, simulate and portray WRESTLER's name, likeness, voice, personality, personal identification and personal experiences, characters if owned by him or PROMOTER, incidents, situations and events which heretofore occurred or hereafter occur (in whole or in part) as it relates in any manner to WRESTLER's life and WRESTLER's wrestling career, in connection with the licensing, sublicensing, manufacture, distribution, publication, and exploitation of WRESTLER's autobiography or authorized biography (collectively "Book Rights").

4.5    Publishing Rights.   WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to use, simulate and portray WRESTLER's name, likeness, voice, personality, personal identification and personal experiences, characters if owned by him or PROMOTER, incidents, situations and events which heretofore occurred or hereafter occur (in whole or in part) as it relates in any manner to WRESTLER's life and WRESTLER's wrestling career, in connection with the creation and sale of certain movies, or other forms of media now known or hereinafter discovered, as PROMOTER shall determine in its sole discretion (collectively "Publishing Rights").

4.6.    Auction Sale Rights.   WRESTLER agrees and grants PROMOTER during the Term the unconditional and exclusive right throughout the world to sell via the Internet, television or through any other distribution method now known or hereafter created, by an auction method, any item containing WRESTLER Intellectual Property which shall include but not be limited to items containing WRESTLER's signature ("Auction Sale").

## 5. EXCLUSIVITY

5.1    It is the understanding of the parties that, during the Term, the worldwide rights to WRESTLER's services, appearances and/or performances in the entertainment industry, whether related to professional wrestling, sports entertainment or Other Appearances, are exclusive to PROMOTER. Without limiting the generality of the foregoing, it is the further understanding of the parties that all rights, licenses, privileges and all other items herein given or granted or assigned by WRESTLER to PROMOTER hereunder are exclusive to PROMOTER even to the exclusion of WRESTLER.

5.2    In the event WRESTLER desires upon reasonable notice to PROMOTER during the Term either individually or through his authorized representatives to participate in Other Appearances, whether or not procured by PROMOTER, WRESTLER may do so only subject to and conditioned upon PROMOTER's

5

express, written approval and provided that a written sublicense is executed between PROMOTER, WRESTLER, and any relevant third parties ("Permitted Activities"), and further provided that WRESTLER shall not utilize the Intellectual Property in any manner in connection with such Permitted Activities without PROMOTER's written consent. Notwithstanding the foregoing, it is agreed that PROMOTER retains first priority, to the exclusion of any such Permitted Activities, with respect to the use and scheduling of WRESTLER's services at all times during the Term of this Agreement, as defined herein. It is further agreed that PROMOTER shall receive from WRESTLER a management fee to reimburse PROMOTER for its reasonable administrative costs incurred in connection with WRESTLER's participation in each such Permitted Activity provided that PROMOTER's costs shall not be less than ten percent (10%) of any fees received by WRESTLER for each such Permitted Activity described herein. Additionally, all monies earned by WRESTLER from such Permitted Activities in a specific Contract Year shall be credited against the Minimum Annual Compensation for that Contract Year as set forth in paragraph 7.1 below.

## 6. TERM AND TERRITORY

6.1    Unless terminated pursuant to the terms herein, the term of this Agreement shall be for three (3) years from the Effective Date ("Term"). Each consecutive twelve (12) month period during the Term commencing with the Effective Date shall be referred to as a "Contract Year".

6.2    Notwithstanding anything herein to the contrary, termination of this Agreement for any or no reason shall not affect PROMOTER's ownership of and rights in or to any intellectual property rights, including but not limited to, any Works, PROMOTER Intellectual Property and any registrations thereof, or the rights, results, products, and proceeds in and to and derived from WRESTLER during the Term of this Agreement; and the exploitation of rights set forth in Sections 1, 2, 3 and 4 hereof in any and all media now known or hereinafter discovered.

6.3    The territory of this Agreement shall be the world ("Territory").

## 7. PAYMENTS/ROYALTIES

7.1    (a)    Unless terminated pursuant to the terms herein, PROMOTER shall pay WRESTLER each Contract Year the total sum of Thirty One Thousand Two Hundred US Dollars (US$31,200.00) (referred to hereinafter as "Minimum Annual Compensation"). PROMOTER agrees, commencing with the Effective Date, to pay WRESTLER the Minimum Annual Compensation in fifty-two (52) weekly installments consistent with PROMOTER's regular payment procedures.

(b)    Moving Expenses:    In further consideration of WRESTLER's obligations hereunder, PROMOTER shall, in addition to the amounts set forth in paragraph 7.1(a) above, pay WRESTLER a one-time moving allowance to assist WRESTLER's relocation from Lancaster, Pennsylvania to Tampa, Florida in the amount of Two Thousand US Dollars ($2,000.00) within fifteen (15) calendar days after PROMOTER executes this Agreement.

(c)    PROMOTER shall be entitled to deduct from the Minimum Annual Compensation any fines levied against WRESTLER, as provided for in Sections 8.3 or 9.13(a); any costs or expenses paid by PROMOTER on behalf of WRESTLER, as provided for in Sections 8.1 and 9.13(b); or any deductions permitted as set forth in Section 7.13 and 10.2(b). PROMOTER shall also have the right to credit against the Minimum Annual Compensation: (i) any royalties earned by WRESTLER; (ii) any payments made to WRESTLER by PROMOTER in accordance with Section 7.2; and/or (iii) any other payments due or earned by WRESTLER for the rights granted herein or pursuant to the terms of this Agreement. For the purposes of this Agreement, any royalty payments due shall be deemed "earned" only at the time they are paid to WRESTLER.

(d)      Unless terminated for breach pursuant to Sections 12.1(a) through (f) and 12.2, if applicable, at least one hundred twenty (120) days after each Contract Year, if it is determined that WRESTLER has earned more than the Minimum Annual Compensation for services rendered during that Contract Year, WRESTLER shall be paid subject to any permitted deductions or credits in accordance with Section 7.1(c), in a one lump sum the difference between the Minimum Annual Compensation and what WRESTLER actually earned for services rendered during that Contract Year.

7.2      (a)      If WRESTLER appears and performs in any Non-Televised Live Event, defined as an Event produced by PROMOTER in an arena before a live audience at which admission is charged other than those arena events which are taped or broadcast as set forth in   Sections 7.2 (b) and 7.2 (c) below, WRESTLER shall be paid by PROMOTER an amount equal, in PROMOTER's sole discretion,  to such percentage of the paid receipts for such Non-Televised Live Event only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards PROMOTER establishes specifically for such Non-Televised Live Event.

        (b)      If WRESTLER appears and performs in connection with an arena or studio Event produced by PROMOTER which is taped or broadcast for use on PROMOTER's television network ("TV Taping"), WRESTLER shall be paid by PROMOTER, in its sole discretion, an amount only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards PROMOTER establishes specifically for such TV Taping.

        (c) .    If WRESTLER appears and performs in connection with an arena or studio Event produced by PROMOTER which is aired or broadcast via satellite broadcast or pay-per-view distribution technology for use by PROMOTER ("Pay-Per-View"), WRESTLER shall be paid by PROMOTER an amount in accordance with the nature of the match in which WRESTLER performs, i.e., preliminary card, mid card, main event, etc., or any other standard PROMOTER, in its sole discretion, establishes specifically for that Pay-Per-View.

7.3      Licensed Product Sale

        (a)      Licensed Product Sale--Sole Performer.  In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Licensed Product Sale, WRESTLER shall be paid twenty-five percent (25%) of the Licensed Products' Net Receipts received by PROMOTER with respect to the Licensed Product Sale.  Licensed Products' Net Receipts means the gross amount received by PROMOTER from a Licensed Product Sale less expenses incurred by PROMOTER or its licensing agent.

        "Licensed Product Sale" shall mean the sale, other than an Auction Sale as defined in Section 7.7, of any product, merchandise, consumer material or good, other than Books as defined in Section 7.8 and Pay Per View DVD/Home Videos as defined in Section 7.6(a), which is made pursuant to a license agreement between PROMOTER and a party wherein a party is granted the contractual right and obligation to manufacture, distribute, and sell the product, merchandise, consumer material or good to wholesale and/or retail customers through designated distribution channels.

        "Other PROMOTER Talent" shall mean a professional wrestler who has an agreement with PROMOTER and to whom PROMOTER is obligated to pay royalties.

        (b)      Licensed Product Sale---Other Performers.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Licensed Product Sale, PROMOTER

shall allocate twenty-five percent (25%) of the Licensed Products Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.4    Direct Sale and Direct Venue Sale

(a)    Direct Sale---Sole Performer.  In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Direct Sale, WRESTLER shall be paid five percent (5%) of the Direct Sales Net Receipts, defined as gross receipts to PROMOTER from a Direct Sale reduced by returns.  "Direct Sale" shall mean a sale by PROMOTER by any method other than a Licensed Product Sale, Auction Sale, or a Direct Venue Sale, as defined in Section 7.4(c), wherein PROMOTER has or retains the right and/or obligation to manufacture, distribute or sell any product, merchandise, consumer material or good, other than Books and Pay Per View DVD/Home Videos, to an end user and where such sale may be made by any distribution method (e.g., catalog, television or any internet site owned or controlled by PROMOTER).

(b)    Direct Sale---Other Performers.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Direct Sale, PROMOTER shall allocate five percent (5%) of the Direct Sales Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

(c)    Direct Venue Sale---Sole Performer.  In the event that the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent via a Direct Venue Sale, WRESTLER shall be paid five percent (5%) of the Direct Venue Sales Net Receipts, defined as gross receipts to PROMOTER from a Direct Venue Sale reduced by any expenses charged to PROMOTER by the venue for the sale of the product, merchandise, consumer materials or goods.  "Direct Venue Sale" shall mean the sale by PROMOTER of any product, merchandise, consumer material or good, other than Books and Pay Per View DVD/Home Videos, which occurs in or about the venue of a PROMOTER live event.

(d)    Direct Venue Sale---Other Performers.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent via a Direct Venue Sale, PROMOTER shall allocate five percent (5%) of the Direct Venue Sales Net Receipts to be paid pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.5    Featured Performer

(a)    Licensed Product Sales.  If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Licensed Product Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.3(b), PROMOTER shall pay five percent (5%) of the Net Receipts paid to PROMOTER with respect to the Licensed Product Sale of the DVD and/or home videos to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then to WRESTLER and all other Featured Performers in such DVD and/or home videos on an equal/pro-rata basis.  If the aggregate DVD and home video sales pursuant to this Section 7.5(a) exceeds 150,000 units, PROMOTER shall instead pay ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then in the equal/pro-rata basis as set forth in the preceding sentence retroactive to the first 150,000 units.  For the purposes of this Section 7.5, PROMOTER shall determine in its sole discretion whether WRESTLER shall be deemed a "Featured Performer".

(b)    Direct Sale.  If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Direct Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.4(b), PROMOTER

8

shall pay five (5%) percent of the Net Receipts paid to PROMOTER with respect to the Direct Sale of the DVD and/or home videos to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then to WRESTLER and all other Featured Performers in such DVD and/or home videos on an equal/pro-rata basis. If the aggregate DVD and home video sales pursuant to this Section 7.5(b) exceeds 150,000 units, PROMOTER shall instead pay ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then in the equal/pro-rata basis as set forth in the preceding sentence retroactive to the first 150,000 units.

(c)     Direct Venue Sale.  If WRESTLER is considered a "Featured Performer" in respect of the sale of the first one hundred and fifty thousand (150,000) units of a DVD and/or home video which is made pursuant to a Direct Venue Sale then, in addition to the compensation due WRESTLER pursuant to Section 7.4(d), PROMOTER shall pay five (5%) percent of the Net Receipts paid to PROMOTER with respect to the Direct Venue Sale of the DVD and/or home video to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then to WRESTLER and all other Featured Performers in such DVD and/or home videos on an equal/pro-rata basis. If the aggregate DVD and home video sales pursuant to this Section 7.5(c) exceeds 150,000 units, PROMOTER shall instead pay ten percent (10%) of PROMOTER's Net Receipts paid to PROMOTER to WRESTLER if WRESTLER is the only Featured Performer or if there are multiple Featured Performers then in the equal/pro-rata basis as set forth in the preceding sentence retroactive to the first 150,000 units.

7.6     Pay Per View DVD/Home Video

(a)     Sold By Licensees As A Single Unit.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in a single unit sale of "Pay Per View DVD/Home Videos" which is sold by a third party pursuant to a license agreement, PROMOTER shall allocate twenty-five (25%) percent of the "Net Receipts" to a talent royalty pool, for which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent for appearing in the live Pay-Per-View.  "Net Receipts" shall mean the gross amount received by PROMOTER for any sale pursuant to this Section 7.6(a) less any and all costs incurred by PROMOTER or its licensing agent. "Pay Per View/DVD Home Videos" shall mean a DVD and/or home video produced by PROMOTER which is a reproduction of an entire live pay per view event, as set forth in Section 7.2(c).

(b)     Sold By Licensees As A Collection Set.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in the sale of a collection set featuring multiple Pay Per View DVD/Home Videos (e.g., Wrestlemania Box Set") ("Collection Set"), which is sold by a third party pursuant to a license agreement, PROMOTER shall allocate twenty-five (25%) percent of the Net Receipts as defined in Section 7.6(a) to a talent royalty pool, which talent royalty pool shall be divided into separate talent royalty pools based upon the number of videos or DVDs included in the Collection Set and then, PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent at the time that the individual video and/or DVD that is part of the Collection Set was first released.

(c)     Sold By PROMOTER As A Single Unit.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in a single unit sale of Pay Per View DVD/Home Videos which is sold by PROMOTER directly, via a distribution agreement or through any means whatsoever, other than via a licensing agreement, PROMOTER shall allocate five (5%) percent of the "Net Receipts" to a talent royalty pool, for which PROMOTER shall pay WRESTLER and all Other PROMOTER

9

Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage, as set forth in Section 7.2(c), that was paid to WRESTLER and all Other PROMOTER Talent for appearing in the live Pay-Per-View. "Net Receipts" shall mean the gross amount received by PROMOTER for any sale pursuant to this Section 7.6(c) less any and all costs incurred by PROMOTER or its licensing agent.

(d)    Sold By PROMOTER As A Collection Set.  In the event that the Intellectual Property is used together with the intellectual property of Other PROMOTER Talent in the sale of a Collection Set which is sold by PROMOTER directly, via a distribution agreement or through any means whatsoever, other than via a licensing agreement, PROMOTER shall allocate five (5%) percent of the Net Receipts, as defined in Section 7.6(c), to a talent royalty pool, which talent royalty pool shall be divided into separate talent royalty pools based upon the number of videos or DVDs included in the Collection Set and then, PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such Pay Per View DVD/Home Videos pro-rata based upon an amount equal to the same percentage as set forth in Section 7.2(c) that was paid to WRESTLER and all Other PROMOTER Talent at the time that the individual video and/or DVD that is part of the Collection Set was first released.

7.7    Auction Sale

(a)    Sole Performer.  In respect of an Auction Sale pursuant to Section 4.6, if the Intellectual Property is used alone and not in conjunction with the intellectual property of Other PROMOTER Talent, WRESTLER shall be paid thirty five (35%) percent of the "Net Sales", defined as the gross revenue received for an Auction Sale less (i) the cost of goods related to the item sold; (ii) any shipping or freight charges; and (iii) PROMOTER's administrative fee which shall be equal to thirty (30%) percent of the gross revenue received from the Auction Sale of the item sold.

(b)    Other Performers.  In respect of an Auction Sale pursuant to Section 4.6, if the Intellectual Property is used together with intellectual property of Other PROMOTER Talent, PROMOTER shall allocate thirty five (35%) percent of the "Net Sales" defined in Section 7.7 (a) to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all Other PROMOTER Talent appearing in such product pro-rata among WRESTLER and all Other PROMOTER Talent featured on the product, good or merchandise.

7.8    Book Sales.  In the event that pursuant to the rights granted in Section 4.4 above, PROMOTER publishes or grants to a third party the right to publish WRESTLER's autobiography ("Book"), WRESTLER shall be paid an amount which shall be equal to fifty percent (50%) of the "Licensed Products' Net Receipts" less the cost  of any photography, illustration and/or writer fees.  For the purpose of this Section 7.8, "Licensed Products' Net Receipts" shall mean the gross amount received by PROMOTER from the publication, sale and distribution of the Book less any out of pocket expenses incurred or paid by PROMOTER, other than photography, illustration and/or writer fees which are the sole responsibility of WRESTLER.

7.9    Publishing Rights.  As respects WRESTLER's compensation in connection with PROMOTER's or PROMOTER's designee's exploitation of the Publishing Rights granted to PROMOTER as set forth in Section 4.5, the parties shall negotiate in good faith for a period of thirty (30) days commencing immediately after PROMOTER advises WRESTLER that PROMOTER desires  to exploit the Publishing Rights ("Negotiation Period").  However, upon the expiration of the Negotiation Period, if the parties have not agreed on the compensation to be paid WRESTLER for PROMOTER's exploitation of the Publishing Rights, the parties agree that WRESTLER shall be paid an amount that is equal to the lowest compensation paid by PROMOTER within the previous three (3) years to Other PROMOTER Talent who have received payment for PROMOTER's exploitation of such talent's own Publishing Rights.

7.10    Subject to paragraph 12.2, as it relates to WRESTLER's appearance or performance of any services pursuant to this Agreement, including the appearance and or performance of WRESTLER's services at Events or at other activities conducted by PROMOTER, WRESTLER shall be eligible only for the payments and royalties specifically set forth in Sections 7.1 through 7.9.

7.11    No Royalties Paid to WRESTLER.  Except as specifically set forth in Section 7.1 through 7.9 above, WRESTLER shall not be eligible for any payment or royalties with respect to any other goods, services or otherwise including without limitation to the following:  television license fees; television subscription fees; internet subscription fees; subscription video on demand fees; magazine subscription fees and/or advertising; and/or distribution fees of any kind paid to PROMOTER by any entity in connection with the exploitation of the Intellectual Property.

7.12    All payments made to WRESTLER are in full without withholding, except where required by law.  After the end of each calendar year, PROMOTER shall issue to WRESTLER Internal Revenue Service Form 1099 showing all payments to WRESTLER during that calendar year.

7.13    If WRESTLER at any time during the Term is unable to wrestle for six (6) consecutive weeks due to an injury suffered while performing services at PROMOTER's direction, PROMOTER may: (i) for every Non-Televised Live Event or TV Taping, as described in Sections 7.2(a) and (b), reduce the Minimum Annual Compensation by .5%; and/or (ii) for every Pay-Per-View as described in Section 7.2(c), reduce the Minimum Annual Compensation by the average pay received by WRESTLER for the three (3) immediately preceding Pay-Per-Views or, if WRESTLER appeared in fewer than three (3) Pay-Per-Views, then the average WRESTLER receives for such similar events ("Similar Event") or .5% if WRESTLER did not appear in any such Similar Event.

7.14    (a)    PROMOTER shall prepare and send statements as to royalties payable hereunder to WRESTLER within ninety (90) days following the end of each quarter, based upon the royalties received and processed by PROMOTER in the previous quarter, together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf.

(b)    PROMOTER shall maintain books of account related to the payment of royalties hereunder at its principal place of business.  WRESTLER, or WRESTLER's designated independent certified public accountant who is a member in good standing of the AICPA, may at WRESTLER's sole expense examine PROMOTER's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during PROMOTER's normal business hours and upon reasonable notice.  Such audit shall be conducted in a manner that will not unreasonably interfere with PROMOTER's normal business operations. WRESTLER shall not audit PROMOTER's books and records more than twice during any calendar year and no such audit shall be conducted later than six (6) months after the most recent statement of royalties is given, delivered or sent to WRESTLER.  Each audit is limited to five (5) days in duration.  Statements of royalties may be changed from time to time to reflect year-end adjustments, to correct clerical errors and for similar purposes.

(c)    WRESTLER shall be deemed to have consented to all statements of royalties and all other accountings provided by PROMOTER hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless an audit has been conducted by WRESTLER to PROMOTER within one (1) year from the date the royalty statement was given, delivered or sent to WRESTLER.

(d)    No claim shall be filed pursuant to Section 13.8 below against PROMOTER or PROMOTER's affiliates that disputes any statement of royalties or accounting given by PROMOTER hereunder or that makes

11

any claim for royalties or royalty payments, unless the same is commenced or filed within one (1) year after the date such statement or accounting is first given, delivered or sent to WRESTLER, and unless WRESTLER has first exhausted his remedies pursuant to Sections 7.14(b) and (c) above.

## 8. PROMOTER'S OBLIGATIONS

8.1    Although under Section 9.1 WRESTLER shall bear responsibility for obtaining appropriate licenses for participating in wrestling exhibitions, PROMOTER shall be responsible for obtaining all other appropriate licenses to conduct professional wrestling exhibitions involving WRESTLER. If PROMOTER, at its discretion, agrees to assist WRESTLER in obtaining such licenses, which shall include any permits, visas, or otherwise, WRESTLER shall reimburse PROMOTER for its fees and expenses incurred in connection therewith.

8.2    PROMOTER shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance hereunder and WRESTLER's standing in the professional wrestling community, all of which shall benefit WRESTLER:

(a)    In connection with WRESTLER's appearances and performance at any Events produced by PROMOTER and staged before a live audience, PROMOTER shall bear the cost of location rental, PROMOTER's third party comprehensive liability insurance for the benefit of the venues, applicable state and . local admission taxes, promotional assistance, sound and light equipment, wrestling ring, officials, police and fire protection, and such additional security guards as PROMOTER shall require in its discretion during a professional wrestling match;

(b)    In connection with the production, distribution, and exploitation of the Footage, PROMOTER shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication; and

(c)    In connection with any product or service licensing activities and/or merchandising activities, PROMOTER shall bear all costs of negotiating, securing or otherwise obtaining the product or service licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the product or service licensing activities; and PROMOTER shall bear all costs of creating, designing, developing, producing and marketing merchandise or services. In order to fulfill these obligations, PROMOTER may make any arrangements, contractual or otherwise, it deems appropriate to delegate, assign, or otherwise transfer its obligations.

8.3    PROMOTER shall schedule the Events and book WRESTLER for the Events. In doing so, PROMOTER shall select the time and location of the Events at which WRESTLER is booked, WRESTLER's opponent, and any other wrestlers who will appear at such Event. PROMOTER shall provide WRESTLER with reasonable advance notice of the date, time, and place of any such Event, and WRESTLER shall appear at the designated location for any such Event no later than one hour before the designated time. If WRESTLER fails to appear as required without advance twenty-four (24) hours notice to PROMOTER and PROMOTER must substitute another wrestler to appear in WRESTLER's place at the Event, then PROMOTER may fine, suspend or terminate WRESTLER in its sole discretion.

8.4    Notwithstanding the above, if WRESTLER shall be prevented from appearing at an Event by reason of Force Majeure, the above fines shall not be imposed. For purposes of this Agreement, Force Majeure shall mean any act of God, fire, flood, war or other calamity; strike or labor difficulties; any governmental action or any other serious emergency affecting WRESTLER which occurrence is beyond WRESTLER's reasonable control, and, which despite best efforts prohibits WRESTLER's performance or appearance at such Event.

12

## 9. WRESTLER'S OBLIGATIONS

9.1     WRESTLER shall bear responsibility for obtaining all appropriate licenses to engage in, participate in, or otherwise appear in professional wrestling exhibitions.

9.2     WRESTLER shall be responsible for WRESTLER's own training, conditioning, and maintenance of wrestling skills and abilities, as long as they do not interfere with WRESTLER's appearance at scheduled events as follows:

(a)     WRESTLER shall establish his own training program, shall select time of training, duration of training, exercises, pattern of exercise and other actions appropriate to obtaining and maintaining physical fitness for wrestling. WRESTLER shall select his own training apparatus, including mats, weights, machines and other exercise paraphernalia. WRESTLER is responsible for supplying his own training facilities and equipment, whether by purchase, lease, license, or otherwise; and

(b)     WRESTLER shall establish his own method of physical conditioning, shall select time for conditioning, duration of conditioning and form of conditioning. WRESTLER shall select time for sleep, time for eating, and time for other activities. WRESTLER shall select his own foods, vitamins and other ingested items, excepting illegal and/or controlled substances and drugs.

9.3     WRESTLER shall be responsible for providing all costumes, wardrobe, props, and make-up necessary for the performance of WRESTLER's services at any Event and WRESTLER shall bear all costs incurred in connection with his transportation to and from any such Events (except for those transportation costs which are covered by PROMOTER's then current Travel Policy), as well as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his appearance at such Events.

9.4     WRESTLER shall use best efforts in employing WRESTLER's skills and abilities as a professional wrestler and be responsible for developing and executing the various details, movements, and maneuvers required of wrestlers in a professional wrestling exhibition.

9.5     WRESTLER shall take such precautions as are appropriate to avoid any unreasonable risk of injury to himself and to others in any and all Events. These precautions shall include, without limitation, pre-match review of all wrestling moves and maneuvers with wrestling partners and opponents; and pre-match demonstration and/or practice with wrestling partners and opponents to insure familiarity with anticipated wrestling moves and maneuvers during a wrestling match. In the event of injury to WRESTLER, and/or WRESTLER's partners and opponents during a wrestling match, WRESTLER shall immediately signal partner, opponent and/or referees that it is time for the match to end; and WRESTLER shall finish the match forthwith so as to avoid aggravation of such injury.

9.6     WRESTLER shall use best efforts in the ring in the performance of wrestling services for a match or other activity, in order to provide an honest exhibition of WRESTLER's wrestling skills and abilities, consistent with the customs of the professional wrestling industry; and WRESTLER agrees all matches shall be finished in accordance with the PROMOTER's direction. Breach of this Section 9.6 shall cause a forfeiture of any payments due WRESTLER pursuant to Section 7 and shall entitle PROMOTER to terminate this Agreement, or suspend WRESTLER without pay, but such breach shall not terminate PROMOTER's licenses and other rights under this Agreement. If PROMOTER in its discretion suspends this Agreement, when reinstated, PROMOTER may extend the Term of this Agreement for a period of time equal to the period of suspension or any portion thereof and this Agreement will therefore continue to be of full force and effect throughout the remainder of the Term.